all, and New York State Education at all. I see we have Mr. Kipnis for the calendars. You have two minutes for rebuttal, and you can begin whenever you're ready. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, Joshua Kipnis, Patterson, Belknap, Webb, and Tyler, on behalf of plaintiffs in the class. Tens of thousands of students with disabilities across New York City were denied the rights to a free, appropriate public education during the city's periods of remote and blended learning. This is not contested. The city and the state have admitted that countless city students with disabilities did not receive needed services during the pandemic. The question now is how to provide that relief to which these students are entitled as quickly as possible so that the harm and loss are not compounded further. Plaintiffs allege that the city's existing administrative process is totally inadequate to address those system-wide harms. It's the system that's required by federal law. The system that they have in place right now is not in compliance with federal law. You didn't say that. That's a little bit different. You said it wasn't doing the job. So how is it not in compliance with federal law? It is pervasively in violation, Your Honor, of the 75-day requirement established by the IDEA for ensuring that when cases are filed, that they are resolved within 75 days thereafter. So the relief would be to order the city to come into compliance and do it within 75 days? That would be, I believe, one piece of the relief that would be appropriate here. However, this court has also recognized that when the nature... You would agree that this is a little unusual situation, the governor closed the school. How many students are there in the New York City School District? With IEPs, Your Honor? No, just let's start with how many students in the New York City School. I suspect you know. I'm not sure of the total number, Your Honor. I know that with IEPs, it's about 200,000. 200,000? With IEPs. How many have IEPs? I said 200,000 with IEPs. I'm sorry. 200,000 with IEPs? That's correct. So annually, was the system working adequately prior to Governor Cuomo, then Governor Cuomo, closing the schools? It was not, Your Honor, and it's gotten only worse since then. So your claim is with regard to the system in general? So our claim is both with respect to the substantive fake denials that have occurred and did occur during remote and blended learning, and it is also a claim with respect to the inadequacy of the system itself. Well, the substantive denials have a remedy. They can seek a due process here, can't they? Not when they are systemic as they are in this case, Your Honor. This court has recognized this time and again that when the city's failed policies have created a circumstance where... Excuse me. No, you go ahead. ...where students across the district were denied a fate, not because of individual student circumstances, but because of the city's failed failures. But if you have a pandemic and they now have a process in place where they're trying to provide compensatory services outside of the filing of a due process complaint, they've created a procedure where this could happen in an IEP meeting. Why, on the issue of exhaustion, why shouldn't your clients have to see if that system works? I understand your point about the due process hearings and the untimeliness of those hearings, and maybe that's a separate piece for which exhaustion would be futile. But why not let this process play out as it relates to the IEP meetings? Respectfully, Your Honor, that system that the city has postulated is not materially different from what is already in place and required by the IDEA. Essentially, the new requirement that Your Honor has asked for supplemental briefing on is a requirement that there is a page put at the end of IEPs saying, should a student be considered for compensatory services? And then there is a discussion with the IEP team about that. Supplementary services can be agreed to, they don't have to be, they're not reserved for only relief under following a due process hearing, are they? They're not, Your Honor. So a parent has a right, every parent has a right to ask for a new IEP at any given time, don't they? They have a right to request it, it is not always granted. And of these 200,000, how many have requested new IEPs? I don't know, Your Honor. Of your clients, haven't several of them already requested IEPs and obtained them? They all have IEPs, Your Honor. There still needs a representation with regard to at least four. There was a representation made that they had received SERS, which is the Special Education Recovery Services. Yeah. We have spoken to these parents. They are not aware of having received any such services, let alone benefits from those services. No, well, but what I need to know is, your brief seems to imply that certain compensatory services would only be available following a due process hearing. And I don't understand that to be the case at all. I understand it that these folks can, parents can come in, request a new IEP, or even request the compensatory services, and that doesn't require a due process hearing. The compensatory services are available to any student that has an IEP, that feels that compensatory services are necessary, to which their individual committee agrees. Isn't that the case? Students are entitled to compensatory. Compensatory services are available through that process. Whether they're actually awarded or awarded efficiently is a different question, Your Honor, and it's one that I- So you want a non-adversarial system that functions for 200,000 folks monitored by what, the federal courts? By a special master or masters, Your Honor. Non-adversarial. Doesn't that's exactly what they have already? It's not, Your Honor. What I believe that the defendants have done is improperly conflated this initial discussion period with the additional relief that we seek, which is if that discussion period produces a circumstance where the IEP does not deliver sufficient services or services at all. And what happens after that point is that they are saying that we need to submit ourselves- It's going to be on an individualized basis. Each student is going to have different needs and require different services. For you to try to avoid exhaustion, you would have to say this process that they've set up, they're not following that. Hundreds and hundreds of students are requesting to discuss this issue at the meetings and they're refusing to discuss it. Then that would be a systemic failure that would be futile to try to exhaust because they're not even engaging. Here, at least on paper, they're saying they're willing to engage in these meetings and it's part of the meeting and the parents will have an informal discussion, which is what you want. And yet you're telling the district court, forget that, go to a special master. We need a special master. It seems contrary to the whole purpose of exhaustion to see if they could remedy the situation from the pandemic on their own. Your Honor, if we were seeking an award of compensatory services for all of these students through the federal court system, I would agree with you. That would be a different situation. But here, that's not the relief we're seeking and I want to make that very clear. We're not seeking an award of compensatory services. But in each instance, each instance, there will have to be an evaluation of the child's individual difficulties with regard to their education. How the fact that they weren't allowed to be in school and that they were either homeschooled or whatever. And how that affected them and then the particularization of how one remedies it. And the way that's worked out is through the Committee on the Handicapped and the parents. Parents are members of that committee that make that decision, right? They are, under law, part of the committee. However, in practice, that has not worked out at all. And I submit that what has been put forward as a proposal for what the city has done actually does not give any meaningful relief to anyone. Because- I'm not even, I'll be honest with you. I appreciate the fact that we asked for this because we became aware of it after the fact. But I'm also looking at where we were before we knew about this. And I'm having just a very hard time understanding. Of your clients, how many of them have requested new IEPs and been denied because of some policy by the city that just inherently denies them as opposed to they were denied because of a particularization as to the child's needs? So all of our clients have requested compensatory services and none have received them on their IEPs, your honor. None have received them. Isn't that the remedy if there's an IEP and the school fails, the state fails to provide what the IEP requires, then you seek and must get compensatory services which can extend until at age 22 or 23. It may not be satisfactory, but isn't that what the law provides if there's a failure to comply with the IEP? As this court recognized in the Jose P case, what the law requires is a speedy and adequate state remedy to address fake denials. And that's not just a remedy in and of itself of fake denials. It is a procedural guarantee under the IDEA. So one form of relief that- So you're challenging the IDEA structure itself? No, your honor. We are saying- Well, I mean, inherently you've got 200. I can appreciate the dilemma of all these claims and I can appreciate the problem with the fact that these hearings take a long time. We've seen these cases, Judge Jacobs and I had a case out of Connecticut where the litigation went on to the individuals like 23, 24. Curiously, never a new IEP because the parent never requested it. I mean, well, until cyclically they're entitled to it. So it's inherently clunky. I get that, but that's not your claim. Your claim is that the city here somehow is doing something different within the context of the structure that's provided by federal law, right? Yes, your honor. That is part of what we allege. And what we allege is that the city fails to comply with the IDEA's requirements for procedural due process. And most specifically, that is because it is failing to comply as the state has found, failing to comply with the 75-day requirement that cases be closed out after they are initiated. But your relief here is much broader than that. You're not just seeking to have them comply with that 75-day period. You want a special master to basically overtake the whole issue, right? That's much broader than saying they're out of compliance with the 75 days. It is broad, your honor, but the problem is broad. And it's not materially different than the structural reform that this court has ordered in cases like Jose P., Mrs. W. versus Tarazi, and in cases that have followed from there. When there is a systemic inability to address in an adequate manner the claims that are coming out of some cataclysmic issue, and Jose P., a failure to be able to timely process claims. Thank you, Mr. Kipnis. You deserve the two minutes for rebuttal. We now hear from Mr. Rosas. Thank you, your honor. Thank you. Good morning, your honors, and may it please the court. I'm Alan Rosinas. I represent the city of Jalisco. Your honors, we all remember the early stages of the pandemic. It was a time where society basically shut down, but we still had to continue. We were still trying to have society continue to discharge its core functions. This court didn't shut down. We proceeded by Zoom, and it was extremely inconvenient. And you had the teachers, you had the staffing, you had the IEPs, you had the orders. What was done for these 200,000 kids during this shutdown period? Well, right, your honor. I mean, certainly, and shutting down, I mean physically shutting down. None of us shut down. The schools were closed, but kids were getting remote education. What was done for the remote education of kids with disabilities? Your honor, we provided them with technology that they needed to the degree that we could. We provided them with other material things that they needed. The allegation here is that you did not. The allegation here, I think, your honor, is that in some instances we did not. Not that in every instance we did not. And I think that's an important distinction because that's one of the many things that takes this out of a systemic relief situation. That plus the fact that that part of the pandemic is over, they're not seeking injunctive relief at this point. The only thing they're seeking- Why is it a systemic problem if you have 200,000 students made, which obviously I think the city recognizes because of their special needs, weren't able to get services during the remote period and need compensatory services as a result. And you've developed this procedure as part of the IEP. But if they're unhappy with that and want a due process hearing, they say that over 50% of the administrative cases are out of compliance with the 70.5 day requirement. So why isn't that a systemic problem? You can't handle that on a case-by-case basis because what the parents would say, we can't get a hearing. The school year is proceeding. We're not happy with what happened at the meeting, but we can't get a hearing. What's the city's response to that? Well, a couple of things, Your Honor. First, the 75 days, as I understand it, is not a hard and fast requirement in the sense that you can get lawful extensions. And this was barely briefed in this case, Your Honor. This was barely touched on in the briefing. This case is not really about the 75 day requirement. If it were, it would be about every single disabled student, regardless of the pandemic and regardless of how the student was affected during the pandemic. What the plaintiffs are trying to get here- We have a class of plaintiffs who were particularly impacted by the pandemic, who are trying to make up for that. And the process is broken down, at least at that level. Whether or not these IEP meetings will work out, I guess we don't know yet. But certainly we know if it doesn't work out, the likelihood of them getting a hearing to remedy it is not good. I think that the number that they cite repeatedly in their papers, Your Honor, both at the complaint level and in both of their briefs, including their reply brief, is that the due process hearings or the administrative process tends to take an average of about 260 days. Now, Your Honor, it has been over 700 days since they filed their complaint in this federal action. It's unclear to me how they can base their claim here on alleged delay when they themselves have delayed this process for almost two years. They filed it on, I think, November 20th of 2020, nearly exactly two years ago. So I don't know how they can, with a straight face, say the problem here is the delay of 260 days. Instead of blaming them, let me just ask you this basic question. If the city is in fact not complying with that 75 day requirement across a massive number of cases, isn't that by definition a systemic failure or am I missing something? You can't remedy that by individual by individual because it's not happening. There's no hearing. Isn't that by definition a systemic failure? I don't know, Your Honor, because I don't know the extent to which the extensions are lawful up to 260 days. And that wasn't even touched on in the briefing here. Why shouldn't that, instead of dismissing the case for failure to exhaust, why shouldn't that be developed by the district court to see whether or not it would be futile for them to try to use the system if the system is not giving them hearing? Because, Your Honor, the release that they're seeking is not tied to that. The release that they're seeking is this creation of this brand new process that will supplant or at least come before the administrative level, which is not contemplated in or permitted by the IDEA. Well, if the system has in fact broken down to that level, wouldn't that be a potential remedy? Well, if the city is not conducting these hearings, one would be to order the city to do that. But another would be to have some special measure try to oversee how they're going to correct a systemic problem like that, right? Well, Your Honor, again, I- The special measure is not going to go kid by kid, case by case, but is going to make sure that the problem with the 75-day period is remedied. I think there's a whole separate lawsuit, the Eastern District, right? The JES lawsuit, that's precisely about that, right? Well, I've heard something about that lawsuit, Your Honor, and that's another reason that that's not this lawsuit. But I think the important thing to recognize about the allegation that this is a systemic claim at its foundation is that what they are really seeking is a remedy for individual fake violations through this alternative process that is not contemplated, again, not contemplated or permitted by the IDEA. That is not a systemic relief situation. That is not a systemic claim situation. These are individual claims that they're just asking to circumvent the process for them. What I'm suggesting is part of their case may not deal with systemic issues and may be remedied through the administrative process, but there are parts of their claims that may not be. Is that possible? Well, Your Honor, it's possible, but again, that issue was so barely touched on by the briefing that this court, I think, should decline to even touch it. In the sense that they're not even given the context that 75 days is not a hard and fast deadline, Your Honor. Okay. All right. Thank you, Your Honor. Thanks. We're going to hear from the state. Mr. Maggi, if I pronounced that right, did I get that right? Maggi, Your Honor. I'm sorry. Maggi, go ahead. No problem. Good morning. May it please the court, Daniel Maggi on behalf of the state appellees. There are three reasons why the court should affirm plaintiff's claims are moot. They have failed to exhaust, and they have failed to state a claim. Because the city has already addressed the exhaustion points and the mootness points, I would like to focus on the state's argument that plaintiffs have failed. Could they have exhausted? Excuse me? Could plaintiffs have exhausted? Could they have exhausted? Yes, I believe so. They could have exhausted their claims. Their claim is really not open for business for the exhaustion process. I don't believe that that's quite their claim. And as this court has recognized, there's three ways that a plaintiff can demonstrate that they don't have to exhaust. That it's futile, that there's a policy in place, or that there's not an adequate remedy at the hearing. In this case, they're only relying on one in three. And for futility, they're saying there's system-wide violations. But this court has recognized that you can't just plead, there's been a lot of violations. And therefore, exhaustion would be futile for everyone. But there's no question that there's been a lot of violations. I mean, people haven't been able to get IEPs for years. I agree that, according to the complaint, there's been a lot of violations. But it's not enough to plead futility under this court's precedence. You have to also show that there's no remedy available. And here, there is a remedy. They can get compensatory services through the hearing process or through these other- What if they can't get a timely hearing? Your Honor, even if they can't get a timely hearing, as the court noted, compensatory services don't require the hearing. And the city has put procedures in place to get students compensatory services. But if you have a whole series of parents who think those procedures are not working, the law says they get a hearing, right? Yes, they can seek a hearing. If they're not getting the hearing- Well, Your Honor, these- Well, the fact is we don't know what the effect is of the most recent set of procedures set forth by the city with regard to the availability of compensatory services and applying for them and the success rate and or how many cases have moved through the system as a result of this, do we? That's correct, Your Honor. Wouldn't it make sense to send it back to the district court to have the district court to take a look at this to see if this system really does move this out? What troubles me about both your submissions, both sides, this is one of the most frustrating areas to be a judge in. I have a brother who was a building principal of a school in a Buffalo suburb, and these are services that these kids need now, not two years from now. It would be a pyrrhic victory for the appellants to win five years from now, because many of their clients would be 23 and gone. And so it seems to me, and what I would have loved to have seen from both sides was a request for the court for an opportunity to delay the appeal, to have an opportunity to review the matters to see if there's something that could have worked out, except the result was both your briefs opened with its move. Of course, we asked that question, so I understand that. And B, then why it undercuts their view, and of course their response was, this shows that the city's not doing its job, as opposed to maybe there's a common ground here. Put that aside. Tell me why we shouldn't send it back to the district court to allow this system that the city offers as being its way of solving the problem to see if it works. Your Honor, I don't think it's necessary for the court to do so. I think in that circumstance, there's no reason why if, for example, this system didn't work, that plaintiffs couldn't come back to court. Absent that system, haven't they alleged at least a prima facie claim of futility? That there are so many due process hearings out there that they are so far past that 75 days or whatever the standard is across the state. Maybe 150 days, whatever that works out. That it's just not a meaningful remedy whatsoever. Your Honor, I don't believe so, but I would like to point out that the state has separate arguments on this appeal than the city that don't depend on exhaustion. Okay. Including that there's no private right of action to sue a state for violating its general supervision obligation. And here- Well, that might help you. It doesn't do much for the city. That may be correct, Your Honor. Are you cutting and running from your partner? No, Your Honor. I believe in our exhaustion arguments, and I think they're correct. I just wanted to point out to the court that we do have separate arguments. This is serious stuff. I don't want the levity to undercut the sense of seriousness that all of us appreciate that this has. Yes. Go ahead and finish your answer. I apologize. I just wanted to point out that there's no private right of action, and plaintiffs do not identify any language at all in their briefs that would demonstrate clear indication that this court and the Supreme Court require for there to be a private right of action under the IDA to sue a state. They make non-textual arguments about waiver. We did not waive this argument. We presented it below. They argue that this court has held in previous cases that there's private right of action. This court has never held that. There's been other cases where, for example, the state conceded liability, and the court said, well, in that case, of course, the state concedes liability. But this court has never said that a private plaintiff can sue a state under the IDA just for violating its general supervision obligation under Section 1412A11. And I see that my time is up. Thank you. Thank you very much. Thank you, Mr. Manning. Mr. Kipp, you should have two minutes in rebuttal. Thank you, Your Honors. On the first point, Judge Wesley, you had noted that it may have made sense to request a remand to determine whether the new process is appropriate. We specifically suggested- I know you did. Okay. In our supplemental brief- I should have given you credit for that. I apologize. Thank you, Your Honor. And this new proposal that's been put out, it was issued in September. It's brand new. And so it has not actually been implemented yet. I thought it was- correct me if I'm wrong. I thought it was older than that. No. I thought it had its origin early in the pandemic. No, Your Honor. This new proposal that a page be added to the end of the IEPs, that is a brand new proposal. And that is a brand new proposal that has not had an opportunity to be implemented, at least implemented meaningfully at all. Now, based on our client's experience, to the extent that they have had these meetings, they keep on getting the box check no for compensatory services so that they have been unavailing. But this is still a very early process, and it certainly does not make sense to give the defense- You would appreciate that there's a difference between a merits argument about any particular case as opposed to an overarching policy of just generally saying no. Absolutely, Your Honor. All I mean to suggest is that we have no evidence, certainly not at this stage, which is still at the pleading stage. We have no evidence that the proposed fix that they have come up with now is actually a meaningful fix. And to give them the benefit of the doubt on that point- Can I ask you a question? This wasn't in the briefs, and there was no 28-J letter, but the Ninth Circuit in a case called Martinez v. Newsom dealt with a lot of these issues. I don't know if you're familiar with that case, but it essentially concluded that if you're- You have to exhaust- I don't know if you're familiar with that case. I want to see if you think it's any different than this case. I am vaguely, and that is a recent decision by the Ninth Circuit. I believe that they sought a different remedy. They were seeking an award of compensatory services. Here we are seeking a structural remedy. We are not looking for an award of compensatory services for any individual student. We are looking- and I want to be clear, because they have repeatedly suggested that what we're looking for is not provided for by the IDEA. The structural mechanism you're looking for is one that would facilitate and speed up the issuance of IEPs and compliance with it. So if you look beneath that remedy that you're seeking, what you really are seeking is an IEP that is complied with. And if that's what you're seeking, it looks like the statute limits you to compensatory education. Your Honor, this court has, in a number of previous cases, dealt with circumstances where the ultimate relief, or looking beneath, was something that the administrative process could provide. The placement or evaluation of students. That was the ultimate relief slot in Jose P., in Heldman, in Terraza. And yet the court found that that was ultimately immaterial to the challenge, because the challenge there was to the adequacy of the administrative process itself, to be able to properly get to that point. And so even though I recognize that at the end of the day, what we seek for many of these students may include compensatory services, that is not the relevant inquiry at this stage. The relevant inquiry is, have we alleged systemic violations? We have. And can the administrative process award the relief that we seek? And defendants concede that no administrative hearing officer can implement the procedural reform, the structural relief that we are seeking in this lawsuit. Of the 200,000, how many of, in your view, if you know, in your view, how many of the 200,000 would, or profess to think that they are in need of compensatory services? I have no way of knowing, Your Honor, but I can say for certainty that all of them would benefit from a venue that if they are not given compensatory services, to be able to have those heard in a way that complies with the IDEA, which the existing administrative process does not provide them with. All right. Thank you very much. Thank you, Your Honors. Thank you both. Thank you. Have a good day. Next case on the calendar is United States v. Spears-Arreta. We're just going to wait a minute. There's another class that's going to come in, so we're just going to wait one minute so as not to disturb you. You are losing your audience. No, we're going to replace it. No, we're going to replace it, yeah. Another third of students are coming in, so you'll have the same audience. And my students are staying. Yes. The Cornell students are not permitted to leave. It's pass-fail, so the result is extreme. They will be questioned about this argument.  Mr. Glasser, are you all right? He's got me. I was watching it sit down. How was the first verse? It sits down at the very end. It's like a movie theater.     I see. I see. I see. I see. I see. All right, Mr. Glasser.